UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-200 (SRN/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **TRIAL BRIEF OF THE UNITED** |
| | ) | **STATES** |
| DANIEL BERGLUND, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Matthew S. Ebert and Kimberly A. Svendsen, Assistant United States Attorneys, respectfully submits its trial brief in the above-captioned case. This memorandum includes a summary of the facts the government expects the evidence will establish at trial along with briefing addressing the government's motions in limine and other potential evidentiary matters.

## I. BACKGROUND AND EXPECTED TRIAL EVIDENCE

During trial in this matter, the government anticipates it will present evidence establishing the following facts:

Daniel Berglund is a well-educated person who earned his degree in chemical engineering from the University of Minnesota in 1979. He has over 30 years of experience working in the IT industry. Beginning in approximately 1987, he operated his own business—Faith Software—through which he worked as an instructor teaching courses in a variety of computer languages and completing design projects for companies who hired him as a contractor. Despite earning a substantial living,

Berglund has chosen to spend most of his adult life evading the assessment of his federal income taxes and seeking to thwart the IRS's efforts to collect Berglund's tax debts. Berglund made this decision despite having plenty of resources to pay his taxes. Through his company, Faith Software, Berglund regularly earned six figures a year in income. Until he separated from his former wife in 2017, Berglund and his family lived in a comfortable, middle-class home in Cottage Grove, Minnesota.

Despite all of this, Berglund has chosen to engage in a decades-long campaign to prevent the IRS from learning of his income in order to prevent the IRS from assessing him income tax, and then to evade the IRS's efforts to collect on his tax debts. Berglund did so in the face of repeated notice from the IRS and other sources that the money he earned from Faith Software qualified as income, that he is subject to the federal tax laws, and that his arguments to the contrary are wrong.

### A.    Berglund's Early Tax Evasion and IRS Tax Liens

As early as 1988, Berglund had stopped filing federal income tax returns, and the IRS was forced to prepare substitute tax returns on his behalf, to assess Berglund's taxes based on their own examination, and to attempt to locate and obtain assets to pay Berglund's taxes via federal tax liens. The IRS filed tax liens against Berglund for unpaid federal income taxes for 1988, 1989, 1990, 1992, 1993, 1995, 1996, 1997, 2007 and 2009.

In 2011, the IRS initiated efforts to collect on the taxes assessed through substitute returns it filed for Berglund for the 2007 and 2009 Tax Years. Between 2011 and 2015 the IRS repeatedly advised Berglund that he was required to file annual personal income tax returns and that failure to do so could result in the IRS

filing substitutes for return and levy actions.  In 2012, the IRS notified Berglund that they had assessed him to owe $3.1 million in taxes for tax year 2007.  By 2014, the IRS had notified Berglund that he owed an additional $1.8 million for tax year 2009. Berglund disputed both assessments, and both tax years worked their way up through the appeals process.  At the same time, Berglund was peppering IRS personnel with letters containing frivolous arguments and attempting to bully various IRS employees into releasing his tax liens by threatening to "come after" them in their personal capacities if they did not do so.  Throughout the appeals process, Berglund's arguments were repeatedly rejected and the tax liens against him upheld. In 2016, the U.S. Tax Court imposed a $2,500 penalty on Berglund for making frivolous arguments in challenging the IRS's assessment of his 2009 taxes.

Despite having extensive communications and litigation with the IRS, Berglund never disputed the merits of the underlying tax liability.  Rather, he took frivolous positions including a repeated baseless argument that the assessments were invalid because there was no signed summary record of assessment and the like. Berglund also submitted several FOIA requests to the IRS, some of which show his extensive knowledge of IRS procedures and rules concerning income taxes.

### B.   Berglund's Attempts to Evade the Assessment of His Federal Income Tax

Throughout the 2000s and 2010s, Berglund worked as a computer language instructor doing business as Faith Software.  IRS investigators compiled records showing Berglund's unreported gross income from Faith Software for the tax years alleged in the Indictment—2014 through 2017—by collecting invoices he issued to

clients and matching those invoices with bank records.  The invoices were collected during the execution of a search of Berglund's home in April 2018; during trash pulls outside his home prior to executing the warrant; and directly from Berglund's Faith Software clients. The invoices were matched to checks and traced to deposits in four Wells Fargo accounts: Berglund's and his wife's joint checking account, his wife's money market account, his wife's checking account, and Berglund's d/b/a Faith Software checking account. These records reflect that Berglund had income such that he should have been assessed federal taxes of approximately $146,806 for tax years 2014 through 2017.  But Berglund failed to file tax returns—either personal returns or returns for Faith Software—and he took several measures to hide his income from the IRS in order to evade assessment.

Throughout the years that he owned and operated Faith Software, in addition to failing to file tax returns (knowing he was obligated to do so), Berglund took numerous steps to prevent the IRS from learning of his income and thus assessing him with appropriate taxes. Specifically, Berglund provided his Faith clients with Forms W-9, Request for Taxpayer Identification Number and Certification ("W-9"), that contained a false Employer Identification Number ("EIN") and no social security number ("SSN"). A W-9 is an IRS tax form that is used to confirm a person's name, address, and taxpayer identification number so that payments made to them can be accurately reported to the IRS, usually through the filing of a Form 1099-MISC, Miscellaneous Income ("Form 1099-MISC").  In some instances, Berglund provided his clients with a W-9 with the penalty of perjury statement removed that included

the fictitious EIN number for Faith with the intent of concealing income from the IRS that he received from clients.

Instead of using a Wells Fargo account that he had opened in the name of his company, Faith Software, Berglund deposited his clients' payments into other accounts where the funds would not be as easily traced to him, including his wife's personal checking and money market accounts. Of $1,065,607 in client payments received between 2011 and 2017, Berglund deposited just $50,817 in the Faith Software account. The remainder was split nearly evenly between accounts held solely in his wife's name ($476,680) and a joint personal checking account he held with his wife ($515,885), though his deposits increasingly shifted toward accounts held solely in his wife's name. In 2016 and 2017, Berglund deposited $202,973 in client payments into his wife's accounts, and just $21,307 into accounts bearing his name ($11,400 into the couple's joint checking account, and $9,907 into his Faith Software account).

Berglund used some of this money to purchase silver coins and other precious metals, which he hid in various locations around his home. In 2017, IRS obtained an order permitting them to enter his residence to seize the silver. While executing the Order of Entry, IRS personnel found Berglund's coins hidden inside PVC pipes, in boxes hidden in his basement ceiling, and above his kitchen cabinets.

During the same years that Berglund was refusing to file federal income tax returns and attempting to hide his income from the IRS so they could not assess him taxes, there were times when Berglund wanted to do things, like obtain credit, that

required him to demonstrate that he had an income. At those times, Berglund either acknowledged that he was earning an income of between $120,000 and $140,000 a year or he applied for credit in his wife's name and falsely attributed his Faith Software income to her.

During tax years 2014 through 2017, as a result of Berglund's active evasion of the assessment of the federal income taxes that he owes, Berglund has evaded more than $145,000 in federal income tax.

## II.   GOVERNMENT'S MOTIONS *IN LIMINE*

### A.   Motion to Permit IRS Witnesses Jeffrey Wagner and Tim Smith to Testify under Pseudonyms

The government moves to permit two IRS Revenue Officers to testify under the names "Jeffrey Wagner" and "Tim Smith," which are pseudonyms used in their official capacity as officers of the IRS pursuant to Section 10.5.7.9 of the Internal Revenue Manual. IRS agents often work under pseudonyms in order to prevent harassment from the taxpayers they investigate and other members of the public. *See Sanders v. United States*, 53 F.3d 343 at *1 (10th Cir. 1995) (approving IRS agent's use of a pseudonym in a declaration where pseudonym was on file and maintained pursuant to IRS policy).

Examples of such harassment are well-documented in the case law. Tax-defiers, such as Berglund, often dispute IRS employees' authority to collect taxes, and feel justified in taking personal actions against them. *See, e.g., United States v. Kuball*, 976 F.2d 529 (9th Cir. 1992) (tax-defier defendant filed Form 1099s that falsely reported that he had paid income tax and filed liens against IRS employees

whose names appeared on a lien against defendant's truck); *United States v. McBride*, 362 F.3d 360, 372-73 (6th Cir. 2004) (defendant filed a false petition for involuntary bankruptcy against the IRS Agent who investigated him); *United States v. Citrowske*, 951 F.2d 899 (8th Cir. 1991) (tax-defier defendant filed Form 1099s falsely reporting the payment of income to a judge, sheriff's department, and other government employees involved in the foreclosure and liquidation of defendant's property).

As a result of such threats and harassment, both the IRS Restructuring and Reform Act of 1998 and the Internal Revenue Manual authorize the use of pseudonyms by IRS employees, as long as the employee provides adequate justification and obtains approval from the employee's supervisor. Pub.L. 105-206, Title III, 18 U.S.C. § 3706, July 22, 1998, 112 Stat. 778; 1 I.R.M. Abr. & Ann. § 1.2.4.1. A court may permit a testifying employee to use the pseudonym in court. 1 I.R.M. Abr. & Ann. § 1.2.4.7(3). *See, e.g., United States v. 911 Mgmt., L.L.C.*, 2014 WL 28996, at *1 n.1, *2 (D. Or. Jan. 2, 2014) (revenue officer who uses pseudonym testified at bench trial); *United States v. Barry*, 2009 WL 603623, *4, *4 n. 1 (M.D. Fla. 2009) (IRS revenue officer testified using a pseudonym at suppression hearing); *Bates v. Osborn*, 2007 WL 274375, *1, *1 n. 4 (E.D. Cal. 2007) (IRS officer submitted declaration using his pseudonym).

In this case, the names "Tim Smith" and "Jeffrey Wagner" are pseudonyms used by two of the IRS Revenue Officers who attempted to collect taxes from Berglund. The pseudonyms have been registered with the IRS in accordance with IRS procedures governing the use of pseudonyms. Both individuals used these

pseudonyms in all of their dealings with Berglund in this case. *See, e.g., In the Matter of the Tax Indebtedness of: Daniel Berglund*, 17-mj-454-SER, (ECF Nos. 1 and 2) (showing that, after disclosing his use use of a pseudonym, Wagner submitted an application and affidavit to the court that resulted in a judicial Order for Entry on Premises to Effect Levy).

Tax-defier cases such as this one are, by their very nature, often the most likely to provoke anger in the people being investigated and lead to harassment of IRS personnel. Indeed, in this case, Berglund has sent multiple threatening communications to IRS employees (including Wagner and Smith), as non-exhaustively summarized below:

- On February 21, 2017, Berglund filed a lawsuit in U.S. District Court for the District of Minnesota in which Berglund, among other things, sued Wagner as a private individual and sought civil damages. *See Daniel Lee Berglund v. Jeffrey Wagner, Revenue Officer and coworkers, et al. as individuals; Internal Revenue Service (writ of mandamus)*, 17-mc-00011-PAM-DTS (ECF No. 1). Berglund's suit was dismissed without prejudice on June 19, 2017, after he failed to respond and to communicate with the court. *See Berglund*, ECF No. 12 at 1;

- Berglund sent Tim Smith a letter on December 3, 2012, stating, "Tim Smith, I hereby demand that you and any other Internal Revenue Service agents involved in this matter immediately and permanently cease and desist any further collection action[. You] will lose the indemnities afforded you by your position in the Internal Revenue Service and open yourself to legal remedies that target you personally. If I am harmed in any way as a result of such fraudulent collection activities, I will come after you in your personal capacity for actual and punitive damages." (Emphasis in original.);

- On January 2, 2013, Berglund wrote the IRS to demand a copy of Tim Smith's commission paperwork issued by the IRS;

- Berglund sent a letter to IRS employee B.B. on November 23, 2012, in which he, among other things, stated, "I am preparing to sue you in your

8

personal capacity if you do not stop your current course of action against me.  You get one warning.  This is it.";

- Berglund sent a letter to IRS employee A.G. on July 10, 2012, stating, "If you do not make things right with me, I will institute a Commercial Lien Process against you to force you to comply with the law.  The process will allow me to take your paycheck, your bank account, your home, and your future earnings.  You will have no recourse in the courts."  (A copy of that employee's LinkedIn profile was later found by agents who searched Berglund's computer.);

- In a November 21, 2011 letter to the IRS, Berglund demanded to receive copies of IRS agents' commission records issued by the IRS; and

- Berglund wrote IRS employee G.A. on July 9, 2012, and stated, "I hereby demand that you … immediately and permanently cease and desist any further collection … If you do not comply with the law, you will lose indemnities afforded by your position in the Internal Revenue Service and open yourself to legal remedies that target you personally."

Smith has since retired from the IRS, but Wagner continues to work as an IRS Revenue Officer.  Requiring Smith and Wagner to testify using their real names in open court will undermine all of the efforts they and the IRS have adopted to protect them from harassment. Even if Berglund now disavows his previous attempts to threaten and intimidate IRS employees, any members of the general public may observe the trial, including others who have been investigated by Wagner and Smith. Moreover, Berglund sent them threatening communications when Wagner and Smith were merely trying to collect taxes from Berglund. Now that they will have testified in a criminal trial against Berglund, Berglund may well renew his efforts to threaten and harass.  Thus, the need for the pseudonyms is ongoing.

Of course, Berglund is entitled to receive all required *Giglio* and *Brady* information concerning the witnesses. To this end, the government has and will continue to conduct records checks using both the pseudonym and real names for

Smith and Wagner. Disclosable derogatory information under either name—if any exists—will be provided to defense counsel, or be submitted to the Court *in camera* for review. Furthermore, to address the need to avoid any potential conflicts between jurors and trial witnesses, the government proposes to provide a written list of names to the jury with Smith and Wagner's pseudonyms and real names. This written list, which would be filed under seal, would not be read aloud.

Finally, if the court permits Smith and Wagner to testify under their pseudonyms, when they are sworn in as witnesses and asked to state their names for the record they will respond, "My pseudonym is . . ." and explain the reasons for using the pseudonym to the jury. *See, e.g., United States v. Pound*, 2010 WL 2803918, 1 n.4 (E.D. Okla. 2010) (accepting a declaration signed by IRS officer using a pseudonym, where declaration expressly stated that name was a pseudonym, and actual person could be identified); *Bates*, 2007 WL 274375, *1 (declaration acknowledged that name was a pseudonym). This will avoid confusion for the jury and address any potential tension between the witness swearing to testify truthfully and then giving a pseudonym when asked for his name.

Based on the above, the government requests that Revenue Officers Smith and Wagner be allowed to testify under their pseudonyms in the interests of their safety from harassment by Berglund and others, and because the government's record checks and efforts to avoid potential juror conflicts will avoid any potential prejudice to the defendant.

**B.      Motion to Permit the Government to Offer Evidence of Berglund's Prior Dealings with the IRS**

The government intends to offer evidence of correspondence (and related records) concerning Berglund's dealings and communications with the IRS, which either: (1) pre-dated the charged tax years (2014-2017); or (2) occurred within the charged tax years (2014-2017) but concern Berglund's failure to pay taxes in previous years.  Out of an abundance of caution, the government is providing notice to the defendant as to this type of evidence under Federal Rule of Evidence 404(b).  The government, however, does not believe this is other bad acts evidence governed by Rule 404(b), but rather this evidence is *res gestae*, and it is therefore admissible "as intrinsic evidence to show the full context of the crime charged and as 'direct proof of a charged crime that includes a plan or scheme element.'"  *United States v. Holliman*, 291 F. 3d 498, 502 (8th Cir. 2002) (quoting *United States v. Carroll*, 207 F.3d 465, 468 (8th Cir. 2000)).   Rule 404(b) does not apply to acts which are "inextricably intertwined" with the charged crime.  *United States v. Aldridge*, 561 F.3d 759, 766 (8th Cir. 2009).

Evidence concerning Berglund's previous unpaid taxes is relevant to show that his actions to evade assessment subsequently, in 2014 through 2017, were willful, an element the government is required to prove.  According to the Eighth Circuit Model Jury Instructions, "To act 'willfully' means to voluntarily and intentionally violate a known legal duty."  Model Criminal Jury Instructions for the Eighth Circuit, § 6.26.7201 (2019).  Accordingly, the government will need to present evidence about Berglund's awareness of his legal duty to pay federal income taxes.  To that end,

evidence of tax liens dating back to the 1980s is admissible because it clearly demonstrates Berglund's longstanding awareness of this duty.   In addition, Berglund's correspondence with the IRS and other parties at various points between approximately 2011 and 2017 about his 2007 and 2009 tax liabilities shows that he is aware of his duty to file income tax returns and pay taxes and he has a general understanding of the process for doing so.   More specifically, Berglund engaged in correspondence with the IRS about his 2007 and 2009 tax liabilities, which, among other things, shows that Berglund is aware of how the IRS tracks taxable income through the use of Taxpayer Identification Numbers.   This evidence is admissible as *res gestae.*

Moreover, even if the correspondence (and related records) concerning Berglund's dealings and communications with the IRS about his previous unpaid taxes were considered Rule 404(b) evidence, the evidence is clearly admissible.   The Eighth Circuit has repeatedly indicated that it regards Federal Rule of Evidence 404(b) as a rule of inclusion, "precluding only evidence that is relevant solely to the defendant's character."   *United States v. Jones*, 990 F.2d 1047, 1050 (8th Cir. 1993), *cert. denied*, 510 U.S. 1048 (1994).   This kind of evidence is admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."   Fed. R. Evid. 404(b).   Further, where knowledge is an element of the crimes charged, evidence of other acts tending to establish that element is generally admissible.   *United States v. Halk*, 634 F.3d 482, 487 (8th Cir. 2011). Evidence of other crimes, wrongs, or acts is therefore admissible under Rule 404(b) if

it is (1) relevant to a material issue, (2) proved by a preponderance of the evidence, (3) higher in probative value than prejudicial effect, and (4) similar in kind and close in time to the crime charged.  *Id.*  Here all elements for admissibility are satisfied.

### 1.    The evidence is relevant to a material issue.

For each count of the Indictment, the government must prove that Berglund willfully evaded the assessment of income taxes for tax years 2014 through 2017.  The government will present substantial evidence that Berglund knew of his duty to file a return and pay income taxes, but it is particularly compelling evidence that Berglund likewise filed no returns and paid no federal income tax prior to 2014, which triggered multiple rounds of correspondence between Berglund and the IRS from approximately 2011 to 2017 concerning Berglund's unpaid taxes for 2007 and 2009. Because of Berglund's protracted dealings with the IRS about his unpaid 2007 and 2009 taxes, he was clearly on notice and aware before and throughout 2014 through 2017 of his legal duties with respect to federal income taxes. This evidence is thus highly relevant to the issue of knowledge and absence of mistake.

### 2.    The evidence is proved by a preponderance of evidence.

The evidence of communications and records concerning Berglund's prior unpaid taxes will be easily proved.  Indeed, there does not appear to be any argument that Berglund was not engaged in constant correspondence and litigation with the IRS about his 2007 and 2009 taxes.  Berglund repeatedly received correspondence at his residence (including receiving personally hand-delivered records from the IRS). Berglund also repeatedly sent items to the IRS under his own name (and often with

a photocopy of his own driver's license).  At no point has Berglund made any claim that he did not send or receive records or correspondence concerning his 2007 and 2009 taxes.  In addition, tax liens against Berglund are entered against him personally involving his various residences, and are clearly associated with Berglund. Accordingly, the evidence will be proved by a preponderance of evidence.

### 3. The evidence is more probative than prejudicial, and the evidence is similar in kind and close in time.

As discussed above, evidence concerning Berglund's previous unpaid taxes began in approximately 1988 but continued uninterrupted throughout his charged period of evasion (2014-2017).  It is not only close in time, but much of that evidence is in fact contemporaneous with the 2014-2017 tax years.  The evidence regarding Berglund's previous unpaid taxes is also probative of the tax evasion crimes alleged in the Indictment.  It demonstrates that Berglund was well aware before and throughout 2014 through 2017 of his duty to file returns and to pay taxes as a result of the torrent of correspondence and litigation he initiated with the IRS for years about his unpaid 2007 and 2009 taxes.  Berglund simply made a decision not to do so. This evidence shows Berglund acted with intent and knowledge, and without mistake or accident when he evaded the assessment of taxes for 2014 through 2017.  This evidence is highly probative.

Under the test for admissibility of 404(b) evidence, the question is not whether the evidence is prejudicial, but rather whether it is <u>unduly prejudicial</u> in light of its probative value.  "Rule 403 is concerned only with '<u>unfair prejudice</u>,' that is 'an undue tendency to suggest decision on an improper basis.'" *United States v. Yellow*, 18 F.3d

14

1438, 1442 (8th Cir. 1994) (quoting F.R.Evid. 404(b) Advisory Committee's Note) (emphasis added).   As a general matter, any relevant evidence offered by the government is prejudicial - indeed, by definition, evidence that tends to show the defendant's guilt is prejudicial.   Because of its probative nature, however, the evidence is not unduly prejudicial.   In contrast, if the evidence being offered was unrelated to the charged offense and was intrinsically inflammatory (such as a murder, rape or child pornography offense), the evidence would likely be unduly prejudicial.   In this case, the Rule 404(b) evidence is extremely probative on the issues of knowledge, intent, and absence of mistake or accident.   Accordingly, the probative value of the evidence substantially outweighs its prejudicial nature.

### C.   Motion to Preclude the Introduction of Materials Containing Misstatements of the Law or Challenging the IRS's Authority to Assess and Collect Income Tax

Based on evidence gathered in this case, the government anticipates Berglund may argue that he is not guilty of tax evasion because he had a good faith misunderstanding of the law and therefore did not willfully evade the assessment of his income taxes. Although a good faith defense is generally available to tax evasion charges, the caselaw provides limits on what evidence Berglund may offer and what arguments he may employ in support of such a defense. The government respectfully requests that the Court order that Berglund not argue, or present any evidence, that the federal tax code is unconstitutional or otherwise invalid.

Tax evasion under 26 U.S.C. § 7201 requires the government to prove that a defendant willfully evaded his taxes. The willfulness element "requires the

Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). A defendant may show that he did not act willfully through evidence that he had a subjective, good-faith belief that the relevant provision of the tax laws did not impose tax liability on him. On the other hand, "a mistaken-belief defense does not encompass situations where the defendant, rather than having a genuine misunderstanding of the law, knows the law but merely disagrees with it." *United States v. West*, 829 F.3d 1013, 1018 (8th Cir. 2016). *See United States v. Beale*, 574 F.3d 512, 518-19 (8th Cir. 2009) (noting that a tax defendant's "idiosyncratic views on our constitutional structure, whether sincere or not, are not good-faith mistakes about what the law is. They are disagreements about what the law should be"). Claims that the tax code is unconstitutional do not constitute good faith. *Cheek*, 498 U.S. at 204-06. Such claims "do not arise from innocent mistakes caused by the complexity of the Internal Revenue Code" but "reveal full knowledge of the provisions at issue and a studied conclusion." *Id.* at 205. "[O]ne cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe that the duty does not exist." *Id.* at 202. Therefore, "a defendant's views about the validity of the tax statutes are irrelevant to the issue of willfulness and need not be heard by the jury, and, if they are, an instruction to disregard them would be proper." *Id.* at 206.

Accordingly, the government moves to preclude Berglund from arguing that federal tax laws are unconstitutional or otherwise invalid, and from introducing any

evidence that contains incorrect statements of law or commentary on the supposed invalidity of tax laws. Berglund may seek to present testimony about his reliance on particular materials provided proper foundation is established—namely, that Berglund actually relied upon the particular material during, or prior to, the commission of the crime. *United States v. Giambalvo*, 810 F.3d 1086, 1095 (8th Cir. 2016); *see also United States v. Marston*, 517 F.3d 996, 1003 (8th Cir. 2008); *United States v. Harris*, 942 F.2d 1125, 1132, n.6 (7th Cir. 1991). But Berglund should not be permitted to admit into evidence materials that misstate the law or call into question the authority of the IRS to impose and collect income taxes. Such evidence would only confuse and mislead the jury, and would have little or no relevance absent evidence that Berglund actually relied on the materials. *See, e.g.*, *United States v. McQuarry*, 816 F.3d 1054, 1058 (8th Cir. 2016) (affirming district court's exclusion of video defendant claimed to be the source of her beliefs regarding lawfulness of alleged tax crime on the grounds that video would confuse the jury and not be as probative as defendant's own testimony regarding her subjective beliefs); *Giambalvo*, 810 F.3d at 1093-94 (affirming trial court's exclusion of testimony regarding potential source of defendant's beliefs regarding IRS's lack of authority to tax because defendant "was the best source of his subjective beliefs, and he testified as to those beliefs"); *United States v. Gustafson*, 528 F.3d 587, 592 (8th Cir. 2008) (upholding, in tax case, exclusion of legal documents and purported legal opinions that the defendant said he relied upon on grounds that materials would be confusing and invade the province of the court to instruct the jury on the law).

17

Many courts have struck a reasonable balance by permitting a defendant to quote portions of third-party materials if those materials are relevant to the issue of willfulness and if the proper foundation is first established. *See United States v. Gaumer*, 972 F.2d 723, 724-25 (6th Cir. 1992) (opining that defendant should be permitted to read relevant excerpts of reliance materials into the record). As with the official source material, however, a court need not allow publication of legal authorities to the jury or allow them into evidence to rebut evidence that the defendant acted willfully. *United States v. Willis*, 277 F.3d 1026, 1033 (8th Cir. 2002); *see also United States v. Simkanin*, 420 F.3d 397, 412 (5th Cir. 2005) (affirming the district court's refusal to admit documents because they were cumulative and might confuse the jury); *United States v. Nash*, 175 F.3d 429, 436 (6th Cir. 1999) (affirming district court's refusal to physically admit certain reliance materials, where defendant was permitted to mention and quote from them); *Gaumer*, 972 F.2d at 725 (opining that trial court need not physically admit hundreds of pages of tax protest documents); *United States v. Willie*, 941 F.2d 1384, 1395 (10th Cir. 1991) (same); *United States v. Hairston*, 819 F.2d 971, 973 (10th Cir. 1987) (holding that defendant's testimony, which included reading portions of tax protest materials, was more probative than the materials themselves). Moreover, although a jury may consider any evidence in determining whether Berglund truly believed that what he was doing was legal, the Court need not admit every piece of evidence Berglund offers. *See Willis*, 277 F.3d at 1033; *Willie*, 941 F.2d at 1394-95.

18

D. **Motion to Preclude the Defendant from Eliciting Self-Serving Statements or Presenting State of Mind Evidence through Third-Party Witnesses**

The government anticipates that Berglund may attempt to present his state of mind evidence through cross-examination of government witnesses, or through his own witnesses, in an attempt to elicit testimony of the witness's opinion as to what Berglund purportedly believed. This calls for impermissible speculation regarding Berglund's state of mind. *See United States v. Hauert*, 40 F.3d 197, 201-02 (7th Cir. 1994) ("[B]y the nature of a tax protestor case, defendant's beliefs about the propriety of his filing returns and paying taxes, which are closely related to defendant's knowledge about tax laws and defendant's state of mind in protesting his taxpayer status, are ordinarily not a proper subject for lay witness opinion testimony absent careful groundwork and special circumstances . . . "); *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) (witness' opinion regarding a defendant's knowledge when witness has testified to defendant's observations, what the defendant was told, and what the defendant said or did "will often not be 'helpful' within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant knew").

The Court should also preclude Berglund from introducing evidence, or eliciting testimony from third-parties, about his state of mind regarding the validity and applicability of federal tax laws because it would almost certainly contain inaccurate, irrelevant, and inadmissible legal conclusions. *See United States v. Tavares-Hernandez*, 639 F. App'x 491, 491 (9th Cir. 2016) (upholding trial court's

decision to prohibit the defendant from cross-examining an IRS agent about what the defendant told that agent regarding what third-parties told the defendant about the federal tax code); *United States v. Hawley*, 592 F. Supp. 1186, 1190 (D.S.D. 1984), *aff'd*, 768 F.2d 249 (8th Cir. 1985) (refusing to grant a new trial on the basis that the court precluded the defendant's expert from testifying because the expert's testimony about the reasonableness of the defendant's beliefs was merely a legal conclusion); *see also United States v. Christensen*, No. CR: 14-8164-PCT-DGC (MHB), 2016 WL 1158893, at *2 (D. Ariz. Mar. 24, 2016) ("Lay opinion does not assist the trier of fact when the testimony relates to an issue, such as credibility of witnesses, that is usually reserved exclusively to the trier of fact for decision or the testimony merely tells the trier of fact how to decide the case." (quotations and alterations omitted)).

Accordingly, Berglund should be precluded from eliciting self-serving statements or presenting "state of mind" evidence through third-party witnesses during trial.

## III.   ANTICIPATED ISSUES DURING TRIAL

### A.   Defendant's Consent to Live Video Testimony from Witnesses C.W. and R.V.L.

On July 8, 2021, the government moved, pursuant to Rule 15 of the Federal Rules of Criminal Procedure, to conduct pretrial depositions of two witnesses:  C.W., a woman from Lockhart, Texas, and R.V.L., a 67-year-old man in Chelmsford, Massachusetts.  (ECF No. 66.)  As further detailed in that motion, C.W. indicated that she is physically unable to travel to testify at trial due to her medical conditions combined with concerns about the COVID-19 virus, and R.V.L. has informed the

government that he is unable to travel to testify at trial due to his concerns about severe illness resulting from the COVID-19 virus, particularly considering his age. (*Id.*)

Berglund opposed the government's motion but explained that deposition testimony prior to trial would be unnecessary if, instead, a "prospective witness testifies remotely at trial." (ECF No. 72 at 4-5.) On August 9, 2021, a hearing was held on the government's motion concerning deposition testimony before the Honorable Magistrate Judge Tony N. Leung. (ECF No. 75.) Following a colloquy with Magistrate Judge Leung about his trial rights, Berglund waived his right to have witnesses C.W. and R.V.L. testify in the courtroom at trial. Instead, Berglund consented to remote video testimony at trial from witnesses C.W. and R.V.L.

At the scheduled pretrial conference, the government respectfully requests an opportunity to discuss with the Court the logistics of arranging live video testimony for these witnesses during the trial. In the meantime, the government has arranged to have an agent at each witness' location to facilitate their remote video testimony. The government will also confer with IT personnel from both the U.S. District Court and the U.S. Attorney's Office concerning the technical logistics.

### B.    Testimony of Berglund's Former Wife

During the trial, the government anticipates offering testimony from Berglund's former wife. The government expects Berglund's former wife will provide testimony regarding her own conduct, regarding conduct that she observed her former husband engaging in, and potentially regarding statements that Berglund made to her after the marriage was dissolved.

21

Courts recognize two distinct privileges arising from the marriage relationship: (1) the adverse spousal testimony privilege and (2) the confidential communications privilege. Neither of these privileges are implicated by the categories of testimony the government intends to offer from Berglund's former wife.

First, the adverse spousal testimony privilege provides that a witness can neither be "compelled to testify nor foreclosed from testifying" adversely against his or her spouse. *Trammel v. United States*, 445 U.S. 40, 53 (1980). The testimonial privilege "may not be asserted after a marriage is terminated, because there is no longer any reason to protect that particular marriage." *United States v. Byrd*, 750 F.2d 585, 590 (7th Cir. 1984) (citing, *inter alia*, *United States v. Lustig*, 555 F.2d 737, 747 (9th Cir. 1977); *United States v. Fisher*, 518 F.2d 836, 840 (2d Cir. 1975); *United States v. Brown*, 605 F.2d 389, 396 (8th Cir. 1979)). Because Berglund and his former wife have been divorced since 2018, the adverse spousal testimony privilege does not apply.

Second, the confidential communications privilege prohibits testimony by one spouse as to confidential communications between the married couple. This privilege "exists to ensure that spouses generally, prior to any involvement in criminal activity or a trial, feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law." *Byrd*, 750 F.2d at 590. This privilege survives the marriage because it is "premised on the assumption that confidences will not be sufficiently encouraged unless the spouses are assured that their statements will never be subjected to forced disclosure." *Id.* at 591. However, a defendant is not

22

entitled to invoke the confidential communications privilege to prevent a former spouse from testifying about communications that took place after the couple was permanently separated, even if the communications took place while the couple was still legally married. *United States v. Frank*, 869 F.2d 1177, 1179 (8th Cir. 1989) (citations omitted).

According to the Stipulated Findings of Fact, Conclusions of Law, Order for Judgment and Judgment and Decree regarding the Berglunds' divorce, which contained stipulated facts and was signed by both parties, Berglund and his former wife were separated and living apart beginning June 10, 2017. Therefore, the confidential communications privilege does not bar the introduction of communications between Berglund and his former wife after June 10, 2017.

### C.  Stipulations and Self-Authentication Pursuant to Federal Rule of Evidence 902

Many of the government's exhibits in this case consist of business records. The government intends to propose a stipulation as to the authenticity and foundation for certain business and public records, including bank records and records from Berglund's Faith Software clients. With respect to any business records for which Berglund is unwilling to stipulate as to foundation, the government intends to introduce certified copies of the records as self-authenticating documents pursuant to Rules 902(11) and 902(4) of the Federal Rules of Evidence. Certifications for these records have been made available for Berglund's review. The government will also

seek to admit certain public records pursuant to the self-authentication provisions of

Rules 803(8) and 902(1) and (2).

Dated:  September 10, 2021                    Respectfully submitted,

                                             W. ANDERS FOLK
                                             Acting United States Attorney

                                             */s/ Matthew S. Ebert*

                                             BY: MATTHEW S. EBERT
                                             KIMBERLY A. SVENDSEN
                                             Assistant U.S. Attorneys