UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-200 (SRN/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DANIEL BERGLUND, )<br>)<br>Defendant. ) | **GOVERNMENT'S POSITION REGARDING SENTENCING** |

The United States of America, by and through its attorneys, Charles J. Kovats, Jr., Acting United States Attorney for the District of Minnesota, and Matthew S. Ebert and Kimberly A. Svendsen, Assistant United States Attorneys, hereby submits this position paper as to sentencing factors. As set forth below, the government respectfully requests that this Court sentence defendant Daniel Berglund to a term of imprisonment of 33 months, at the high-end of his advisory Guidelines range. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing in light of defendant's characteristics and conduct, which includes flagrantly evading taxes for decades.

**I.   BACKGROUND OF DEFENDANT BERGLUND'S EVASION OF TAXES SPANNING DECADES**

Daniel Berglund is an inveterate tax evader. Despite earning a substantial living, Berglund chose to spend most of his adult life evading the assessment of his federal income taxes and seeking to thwart the IRS's efforts to collect his tax debts. Berglund chose this brazen and unlawful course of conduct despite having plenty of resources to pay his taxes. Moreover, Berglund did so in the face of repeated notice

from the IRS and other sources that the money he earned qualified as income, that he is subject to the federal tax laws, and that his arguments to the contrary are flat-out wrong and frivolous. He has earned an appropriately serious sentence.

### A. Berglund's Early Tax Evasion and IRS Tax Liens

Beginning in approximately 1987, Berglund operated his own business—Faith Software—through which he worked as an instructor teaching courses in a variety of computer languages and completing design projects for companies who hired him as a contractor. Through his company, Faith Software, Berglund regularly earned six figures in annual income. (*See, e.g.*, Gov't Trial Ex. 2, Tax Loss Years 2014-2017) and *see* Summary of Client Payments to Daniel Berglund.)

However, as established at trial, as early as 1988, Berglund had stopped filing federal income tax returns, and the IRS was forced to prepare substitute tax returns on his behalf, to assess Berglund's taxes based on their own examination, and to attempt to locate and obtain assets to pay Berglund's taxes via federal tax liens. (PSR ¶ 7.) The IRS filed tax liens against Berglund for unpaid federal income taxes for 1988, 1989, 1990, 1992, 1993, 1995, 1996, 1997, 2007 and 2009. (*See, e.g.*, Gov't Trial Ex. 18, Certified IRS Records for Daniel Berglund for Tax Years 1988-1990, and *see* Gov't Trial Ex. 19, which shows that Berglund last filed a federal tax return for tax year 1997); (PSR ¶¶ 7, 46.)

In 2011, the IRS initiated efforts to collect on the taxes assessed through substitute returns it filed for Berglund for the 2007 and 2009 Tax Years. (PSR ¶ 8.) Between 2011 and 2015 the IRS repeatedly advised Berglund that he was required to file annual personal income tax returns and that failure to do so could result in the

2

IRS filing substitutes for return and levy actions. (*Id.*) In 2012, the IRS notified Berglund that they had assessed him taxes for tax year 2007. (*Id.*) By 2014, the IRS had notified Berglund that he owed additional taxes for tax year 2009. (*Id.*) Berglund disputed both assessments, and both tax years worked their way up through the appeals process. (*Id.*) At the same time, Berglund was peppering IRS personnel with letters containing frivolous arguments, threats, and attempts to bully various IRS employees into releasing his tax liens by threatening to "come after" them in their personal capacities if they did not do so. (*Id.*); (*See, e.g.*, Gov't Trial Ex. 33.) Throughout the appeals process, Berglund's arguments were repeatedly rejected and the tax liens against him upheld. (PSR ¶ 8.) In 2016, the U.S. Tax Court imposed a $2,500 penalty on Berglund for making frivolous arguments in challenging the IRS's assessment of his taxes and noted that Berglund was "no stranger to this Court" and had "been warned multiple times." (*See* Gov't Trial Ex. 76.)

### B. Berglund's Attempts to Evade the Assessment of His Federal Income Tax

As established at trial, Berglund's unreported gross income from Faith Software for the tax years alleged in the Indictment—2014 through 2017—was shown by, among other things, the invoices that Berglund issued to clients which matched corresponding client payments reflected in bank records for bank accounts used by Berglund. (PSR ¶ 9.) Specifically, the invoices were collected during the execution of a search of Berglund's home in April 2018; during trash pulls outside his home prior to executing the warrant; and directly from Berglund's Faith Software clients. (*Id.*) The invoices were matched to checks and traced to deposits in four Wells Fargo

accounts: Berglund's and his wife's joint checking account, his wife's money market account, his wife's checking account, and Berglund's d/b/a Faith Software checking account. (*Id.*) These records reflect that Berglund had income such that he should have been assessed federal taxes of approximately $336,040.45 for federal and state taxes for tax years 2011 through 2017 (which includes $146,806 for federal taxes for tax years 2014 through 2017). (*Id.*) But Berglund failed to file tax returns—either personal returns or returns for Faith Software—and he took several measures to hide his income from the IRS in order to evade assessment.

Throughout the years that he owned and operated Faith Software, in addition to failing to file tax returns (knowing he was obligated to do so), Berglund took numerous steps to prevent the IRS from learning of his income and thus assessing him with appropriate taxes. (*Id.* ¶ 10.) Specifically, Berglund provided his Faith clients with Forms W-9, Request for Taxpayer Identification Number and Certification ("W-9"), that contained a false Employer Identification Number ("EIN") and no social security number ("SSN"). (*Id.*); (*See, e.g.,* Gov't Trial Ex. 85.) In some instances, Berglund provided his clients with a W-9 with the penalty of perjury statement removed that included the fictitious EIN number for Faith with the intent of concealing income from the IRS that he received from clients. (*See, e.g.,* Gov't Trial Ex. 185, 186.)

Instead of using a Wells Fargo account that he had opened in the name of his company, Faith Software, Berglund deposited his clients' payments into other accounts where the funds would not be as easily traced to him, including his wife's

4

personal checking and money market accounts. (PSR ¶ 10.) Of $1,065,607 in client payments received between 2011 and 2017, Berglund deposited just $50,817 in the Faith Software account. (*See, e.g.,* Gov't Trial Ex. 7.)

Berglund used some of this money to purchase silver coins and other precious metals, which he hid in various locations around his home. (PSR ¶ 10.) In 2017, IRS obtained an order permitting them to enter his residence to seize the silver. (*Id.*); (*See, e.g.,* Gov't Trial Ex. 68.) While executing the Order of Entry, IRS personnel found Berglund's coins hidden inside PVC pipes, in boxes hidden in his basement ceiling, and above his kitchen cabinets:



(*See* Gov't Trial Ex. 210.)

During tax years 2014 through 2017, as a result of Berglund's active evasion of the assessment of the federal income taxes that he owes, Berglund has evaded more than $145,000 in federal income tax. However, factoring in relevant conduct (i.e., including state tax losses and including tax losses for 2011, 2012, and 2013, based upon Berglund invoices traced to payments into Berglund bank accounts) results in a tax loss of $336,040.45. (PSR ¶ 9.) Of course that figure, $336,040.45, is a

conservative, underinclusive figure that is but a fraction of the actual tax losses caused by Berglund's unabashed evasion extending back to the 1980s.

After Berglund shuttered Faith Software, he worked as a programmer for Tabula Rasa (formerly Mediture) from 2017 to 2019.  (*Id.* ¶ 44.); (*See, e.g.* Gov't Trial Ex. 215, which shows the W-2s filed by Mediture for Berglund's income for 2018 and 2019.)  However, Berglund still persisted in his refusal to follow the law and pay his income taxes in for 2018 and 2019.  Thus, despite IRS collection efforts dating back to 1988, despite losing in U.S. Tax Court (and other courts) repeatedly and being assessed a $2,500 frivolous penalty in 2016, despite a judicial order authoring IRS civil seizure in 2017, despite a federal search warrant in 2018, despite a federal criminal indictment in 2020 for tax years 2014-2017, and despite a criminal trial and conviction in 2021—*despite all of this*—Berglund has refused to follow the law and refused to pay taxes from at least 1988 through the present.  (*See, e.g.* Gov't Trial Ex. 41.)

## II.     PSR AND THE ADVISORY GUIDELINES RANGE

### A.     Sentencing Range

As set forth in the PSR, the base offense level is 18 for the offense of conviction pursuant to U.S.S.G. § 2T1.1(a)(1) because the tax loss ($336,040.45) is more than $250,000 but not more than $550,000.  (PSR ¶ 18; *see* § 2T4.1(G).)

Thus, the advisory sentencing guideline range, as calculated by the probation officer, is 27-33 months of imprisonment.  (PSR ¶ 49.)  In his December 13, 2021 objections to the Preliminary PSR, Berglund did not address tax loss and did not

6

object to a loss figure of either $146,806 or $336,040. (Dkts. 99, 100.) The Court may rely on the trial record and any unobjected to facts contained in the PSR (Dkt. 103) to sentence Berglund. *See United States v. Campbell*, 986 F.3d 782, 798 (8th Cir. 2021); *United States v. Theimer*, 557 F.3d 576, 578 (8th Cir. 2009). At present, it remains unclear what Berglund's position is with respect to tax loss.

### B. Tax Loss Between $250,000 and $550,000 Is Reasonably Estimated

For cases involving income tax evasion, the tax loss is "the total amount of loss that was the object of the offense (i.e., the loss that would have resulted had the offense been successfully completed)." (U.S.S.G. § 2T1.1(c)(1).) Section 2T1.1 further describes "presumptions" that a sentencing court should employ when calculating the tax loss in various situations involving tax evasion offenses, false return or statement offenses, and failure to file a return offenses. (U.S.S.G. § 2T1.1(c)(1)(A)-(C).) Specifically, these presumptions provide that the tax loss should equal a certain percentage of the unreported gross income, or improperly claimed deductions or exemptions at issue, plus all false credits claimed against tax, "unless a more accurate determination of the tax loss can be made." (U.S.S.G. § 2T1.1(c)(1)(A)-(C).) The commentary to Section 2T1.1 explains that these presumptions are not binding, but rather serve as general formulas:

> In determining the tax loss attributable to the offense, the court should use as many methods set forth in subsection (c) and this commentary as are necessary given the circumstances of the particular case. If none of the methods of determining the tax loss set forth fit the circumstances of the particular case, the court should use any method of determining the tax loss that appears appropriate to reasonably calculate the loss that would have resulted had the offense been successfully completed.

7

(U.S.S.G. § 2T1.1, comment. (n.1).)  Likewise, the commentary states that a court should use an applicable presumption, unless one of the parties "provides sufficient information for a more accurate assessment of tax loss."  (*Id.*)  (*See United States v. Barski*, 968 F.2d 936, 937 (9th Cir. 1992) (per curiam) (rejecting due process challenge to tax loss presumption contained within now-deleted Section 2T1.3; presumption did not establish irrebuttably that tax loss was 28 percent of unreported taxable income, but merely established "the legally operative fact as the amount of unreported income"); *see also United States v. Hoover*, 178 F.3d 1365, 1367-68 (7th Cir. 1999) (affirming use of 28 percent presumption when defendant's lack of records did not permit more accurate calculation).

Ultimately, "[i]n some instances, such as when indirect methods of proof are used, the amount of the tax loss may be uncertain; the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts." (U.S.S.G. §2T1.1, comment. (n.1).)  *See United States v. Hart*, 324 F.3d 575, 578 (8th Cir.2003) (finding no clear error where the trial court accepted the government's calculation of defendant's personal income where defendant failed to keep financial records); *United States v. Pesaturo*, 476 F.3d 60, 73 (1st Cir. 2007) (estimation of tax loss was necessary when defendant did not keep accurate records); *United States v. Bishop*, 291 F.3d 1100, 1114-15 (9th Cir. 2002) (finding no error where the court based its sentence on the government's calculation of tax loss and concluding, "It is not the government's or the court's responsibility to establish the defendants' itemized deductions, if no itemized deduction information was offered by the defendants.");

8

*United States v. Spencer*, 178 F.3d 1365, 1368 (10th Cir. 1999) (recognizing that, although government has the burden of proof, "neither the government nor the court has an obligation to calculate the tax loss with certainty or precision"); *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997) (per curiam) (relying on Section 2T1.1 commentary to uphold tax loss estimation for defendant convicted of assisting in the preparation of numerous false returns; estimation included tax loss extrapolated from unaudited returns).

At the evidentiary hearing, the government intends to call IRS Revenue Agent Margaret Perez, who, very similar to her testimony at trial, will testify regarding the tax loss schedules used to calculate the amount of tax loss, including her review of relevant financial records and tax filings, among other things. Agent Perez will also testify about the government's calculation of restitution. Among other things, Agent Perez can further testify at an evidentiary hearing (as she did at trial) that the government's analysis of the tax loss is based on examination of only those direct transactions where a client payment appeared in one of the bank accounts used by Berglund. As IRS personnel will further explain, the loss calculations for tax years 2011-2017 are conservative and under-inclusive. For example, as Agent Perez testified at trial, if investigators identified a probable payment in a Berglund bank account that could not be confirmed with certainty as a client payment, then investigators did not classify it as taxable income to Berglund. Moreover, the tax loss calculations also factor in, as Agent Perez testified at trial, any applicable deductions

9

in Berglund's favor and also erred on the side of classifying Berglund's filings status in a manner that most decreased his taxable income.

With these (and other factors) in mind, the government has arrived at a combined federal and state tax loss calculation of $336,040.45 for 2011-2017 that, as it can further explain at the hearing, reasonably and conservatively estimates the tax loss. Indeed, to be clear, the figure of $336,040.45 is particularly conservative in light of the ample, well-founded evidence at trial (including through Berglund's own testimony) that he has not paid taxes for decades, which includes a long trail of IRS tax liens and collection efforts dating back to at least 1988. (*See, e.g.*, Gov't Trial Ex. 18, Certified IRS Records for Daniel Berglund for Tax Years 1988-1990, and *see* Gov't Trial Ex. 19, which shows that Berglund last filed a federal tax return for tax year 1997).

### C. The Burden is on Berglund to Establish with Reliable Evidence Any Credit, Deduction, or Exemption that Might Reduce His Tax Loss Amount

However, notwithstanding the $336,040.45 loss calculation, the government anticipates that Berglund might suggest to the Court that otherwise unclaimed or unsupported credits, deductions, and exemptions should now be applied after the fact to reduce his tax loss amount. However, as the Sentencing Commission instructs, a sentencing court "should account for any unclaimed credit, deduction, or exemption that is needed to ensure a reasonable estimate of the tax loss," but only to the extent that three conditions are met. (U.S.S.G. § 2T1.1, comment. (n.3); USSG App. C, amend. 774.)

10

First, the credit, deduction, or exemption must be related to the tax offense and have been claimable at the time the tax offense was committed. (U.S.S.G. § 2T1.1, comment. (n.3(A).)  The Sentencing Commission explained that defendants "should not be permitted to invoke unforeseen or after-the-fact changes or characterizations—such as offsetting losses that occur before or after the relevant tax year or substituting a more advantageous depreciation method or filing status—to lower the tax loss." (U.S.S.G. App. C, amend. 774 at 42.)  The Commission further explained that "To permit a defendant to optimize his return in this manner would unjustly reward defendants, and could require unjustifiable speculation and complexity at the sentencing hearing." (*Id.*)

Second, the otherwise unclaimed credit, deduction, or exemption must "be reasonably and practicably ascertainable." (U.S.S.G. § 2T1.1, comment. (n.3(B).) This "condition reaffirms the Commission's position that sentencing courts need only make a reasonable estimate of tax loss. (U.S.S.G. App. C, amend. 774 at 43.) Specifically, the Commission "recognized that consideration of some unclaimed credits, deductions, or exemptions could require sentencing courts to make unnecessarily complex tax determinations, and therefore concluded that limiting consideration of unclaimed credits, deductions, or exemptions to those that are reasonably and practicably ascertainable is appropriate." (*Id.*)

Third, a defendant who now suggests an otherwise unclaimed credit, deduction, or exemption must present "information to support the credit, deduction, or exemption sufficiently in advance of sentencing to provide an adequate opportunity

11

to evaluate whether it has sufficient indicia of reliability to support its probable accuracy." (U.S.S.G. § 2T1.1, cmt. n.3(C).)

The Guidelines make clear that the burden is on the defendant—not the government—to establish any credit, deduction, or exemption permitted under U.S.S.G. § 2T1.1, comment. (n.3) by a preponderance of the evidence, which is also consistent with the commentary in § 6A1.3. (U.S.S.G. § 2T1.1, comment. (n.3); U.S.S.G. App. C, amend. 774 at 43.) *See United States v. Black*, 815 F.3d 1048, 1056 (7th Cir. 2015) (citing § 2T1.1, cmt. n.3, and holding that the sentencing court did not err when it "correctly determined that it should not have considered [defendant's] unclaimed deductions and other alleged errors" because "[o]nce the government established the tax loss amount, [defendant] had the burden to show that he was entitled to credits or deductions" but the defendant "did not meet his burden").

Even though a defendant may attempt to reduce the amount of tax loss attributable to his offense by introducing evidence of unclaimed expenses or deductions, courts ultimately may reject the assertions of the defendant based upon the particular facts. *See United States v. Hoskins*, 654 F.3d 1086, 1096 (10th Cir. 2011) (sentencing court did not err in declining to accept defendants' proposed deductions, which were self-serving, based on a short and non-representative period of time, and where court could not independently verify the proposed figures); *United States v. Valenti*, 121 F.3d 327, 333-34 (7th Cir. 1997) (upholding refusal of sentencing court to give defendant convicted of tax evasion and failing to file tax returns credit for asserted legitimate business expenses when sentencing court determined that

12

testimony of defendant was speculative and incredible); *United States v. Blevins*, 542 F.3d 1200, 1203 (8th Cir. 2008) (declining to decide "whether an unclaimed tax benefit may ever offset tax loss," but finding the district court properly declined to reduce tax loss based on taxpayers' unclaimed deductions); *United States v. Sherman*, 372 F.App'x 668, 676-77 (8th Cir. 2010).

Accordingly, under the legal framework of the case law and U.S.S.G. § 2T1.1 outlined above, the government submits that Berglund's tax evasion resulted in a loss reasonably calculated to be between $250,000 and $550,000, which the government can more fully address through additional exhibits and the testimony of Agent Perez at the sentencing hearing.

### III. SENTENCING FACTORS

The government respectfully asserts that a high-end sentence of 33 months' imprisonment is appropriate. The sentencing factors under 18 U.S.C. § 3553 most pertinent to this case—namely, (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; and (3) the need for the sentence to promote respect for the law and to afford adequate deterrence—are addressed below.

#### A. Nature and Circumstances of the Offense

Berglund's decades-long tax evasion was an incredibly serious offense, and his sentence should reflect as much. *See* 18 U.S.C. § 3553(a)(2)(A). Tax evasion is not a victimless crime--far from it. Such crimes are an affront to every American citizen who pays taxes and who relies upon the allocation of such taxes for vital services and benefits, including care for veterans and aid for education. The Supreme Court has

long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from who they may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). Simply put, our system risks substantial harm if citizens do not accord themselves truthfully concerning taxes, which is why tax evasion crimes are so serious. *See United States v. Ture*, 450 F.3d 352, 357-58 (8th Cir. 2006) (recognizing that "'[t]ax offenses, in and of themselves, are serious offenses,'" and that "'a greater tax loss is obviously more harmful to the treasury and more serious than a smaller one'") (quoting U.S.S.G. § 2T1.1, cmt. background, and vacating and remanding for resentencing where the sentencing court sentenced a tax evasion defendant to two years of probation, but not to imprisonment, from an advisory Guidelines range of 12 to 18 months' imprisonment).

Berglund's tax crimes cost the U.S. Treasury and the state hundreds of thousands of dollars in actual losses. Moreover, this loss is further aggravated by the manner in which he carried out his evasion. This was not a one-time mistake or a fleeting lapse in judgment. Rather, repeatedly and over the course of decades, Berglund made a conscious and deliberate series of choices to evade taxes. Further, this type of tax crime is particularly hard to detect, and wastes resources on investigations like the one necessitated by his conduct. This prolonged and serious criminal conduct warrants a significant sanction, which the government respectfully submits is a term of 33 months' imprisonment.

B. **Berglund's History and Characteristics**

Berglund's history and characteristics, which offer both mitigating and aggravating factors, further support a sentence at the high-end of the Guidelines range. Berglund is a well-educated person who earned his degree in chemical engineering from the University of Minnesota in 1979. (PSR ¶ 36.) He has over 30 years of experience working in the IT industry. Berglund benefitted from a positive upbringing and, in turn, appears to have provided a similar positive upbring to his own children. (*Id.* ¶¶ 35-37.) These are important and positive characteristics about Berglund and his life, which the government readily acknowledges and which should be considered in fashioning an appropriate sentence.

However, in aggravation, the Court should consider that Berglund's conduct in this case was not a fleeting moment of poor judgment and that he committed this crime without any of the financial hardships or personal problems that might otherwise cause others to engage in crime. Rather, for years, despite having a good life and substantial income, Berglund willfully engaged in tax evasion through an ongoing series of deliberate choices and affirmative acts, which resulted in his own personal benefit at the expense of every other tax-payer. Throughout his criminal conduct, he has also threatened and bullied anyone who tried to suggest that he follow the law. A sentence of 33 months would appropriately account for Berglund's history and characteristics.

15

### C. The Need to Promote Respect for the Law and to Afford Adequate Deterrence

There is no indication that Berglund has learned his lesson. He clearly remains undeterred since he continues to ignore the tax laws and violate the law even after his indictment and conviction. The importance of affording deterrence and promoting respect for the law through appropriately significant sentences is especially important in tax crimes, particularly those involving tax defiers like Berglund. Due to the substantial resources that are necessary to root out and investigate such conduct, criminal tax charges are not common. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. § 2T1.1 (intro. comment). The Eighth Circuit emphasized the special need for deterrence in tax cases. *See Ture*, 450 F.3d at 357-58. Concluding that the district court's granting of a downward variance was unreasonable, the Eighth Circuit noted that "[a]s the Guidelines explain, willful tax evaders often go undetected such that those who are caught ... evading nearly a quarter-million dollars in tax must be given some term of imprisonment." *Id*. at 358. It reasoned that, in the case of willful tax evaders such as Berglund, "[t]he goal of deterrence rings hollow if a prison sentence is not imposed...." *Id*.; *see also United States v. Carlson*, 498F.3d 761, 76-66 (8th Cir.

16

2007) (in rejecting as unreasonable a sentence that varied downward to a non-custodial sentence despite an advisory range of 18-24 months' imprisonment, the Eighth Circuit again emphasized the need for tax-related sentences to, among other things, "promot[e] respect for our federal tax laws" and "give the goal of deterrence adequate weight").

The need for general deterrence is greatest in cases involving particularly lucrative and difficult-to-detect tax crimes. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

Thus, in order to provide adequate general deterrence to other would-be tax evaders, sentences imposed in response to tax crimes—such as Berglund's here with his use of intimidation tactics and frivolous arguments, falsified records, and hidden hard currency assets, (which made his tax crime all the more difficult to detect)— must be substantial. A 33-month sentence will provide an appropriate sanction here. More than that, it will convey clearly to would-be tax evaders that severe consequences will await them should they engage in similar conduct.

Finally, the government requests that the Court impose a term of supervision of three years. As part of his release conditions, Berglund should be ordered to comply with all tax laws, including providing verification to the U.S. Probation Office that he has filed and paid all taxes properly each year. He should also be ordered to sign requisite IRS release forms, so that the U.S. Probation Office can access and verify his compliance.

## IV. CONCLUSION

For the reasons set forth above, the government respectfully recommends that the Court sentence defendant to a 33-month term of imprisonment.

Dated: February 9, 2022                     Respectfully submitted,

                                            CHARLES J. KOVATS, JR.
                                            Acting United States Attorney

                                            */s/ Matthew S. Ebert*
                                            BY: MATTHEW S. EBERT
                                            KIMBERLY A. SVENDSEN
                                            Assistant U.S. Attorneys